RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0420p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

KENTUCKY SPEEDWAY, LLC,

          *Plaintiff-Appellant,*

    *v.*

NATIONAL ASSOCIATION OF STOCK CAR
AUTO RACING, INC. et al.,

          *Defendants-Appellees.*

No. 08-5041

Appeal from the United States District Court
for the Eastern District of Kentucky at Covington.
No. 05-00138—William O. Bertelsman, District Judge.

Argued: July 30, 2009

Decided and Filed: December 11, 2009

Before: GILMAN, COOK, and FARRIS, Circuit Judges.[*]

_____

## COUNSEL

**ARGUED:** Charles Frederick Rule, CADWALADER, WICKERSHAM & TAFT LLP, Washington, D.C., for Appellant. David Boies, BOIES, SCHILLER & FLEXNER LLP, Armonk, New York, for Appellees. **ON BRIEF:** Charles Frederick Rule, Joseph J. Bial, CADWALADER, WICKERSHAM & TAFT LLP, Washington, D.C., Stanley M. Chesley, W. B. Markovits, Fay E. Stilz, Paul M. DeMarco, WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A., Cincinnati, Ohio, Einer R. Elhauge, HARVARD LAW SCHOOL, Cambridge, Massachusetts, Stephen D. Susman, Justin A. Nelson, SUSMAN GODFREY, L.L.P., Houston, Texas, for Appellant. David Boies, Helen M. Maher, BOIES, SCHILLER & FLEXNER LLP, Armonk, New York, Stuart H. Singer, BOIES, SCHILLER & FLEXNER LLP, Ft. Lauderdale, Florida, Guy I. Wade III, Rodney Acker, Oscar Rey Rodriguez, FULBRIGHT & JAWORSKI L.L.P., Dallas, Texas, G. Jack Donson, Jr., TAFT, STETTINIUS & HOLLISTER L.L.P., Cincinnati, Ohio, Robert B. Craig, TAFT, STETTINIUS & HOLLISTER, Covington, Kentucky, Matthew C. Blickensderfer, FROST BROWN TODD, Cincinnati, Ohio, Sheryl G.

---

[*] The Honorable Jerome Farris, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

Snyder, FROST BROWN TODD, Louisville, Kentucky, for Appellees.  Jeffrey A. Lamken, MOLO LAMKEN, Washington, D.C., for Amicus Curiae.

———————————

**OPINION**

———————————

RONALD LEE GILMAN, Circuit Judge.  Kentucky Speedway, LLC (KYS) sued both the National Association of Stock Car Auto Racing, Inc. (NASCAR) and an affiliated company that owns multiple racetracks called International Speedway Corporation (ISC), alleging that they violated federal antitrust laws by not sanctioning a Sprint Cup race at KYS's racetrack in Kentucky and by preventing KYS from purchasing other racetracks that already host such a race.  The district court granted summary judgment in favor of NASCAR and ISC after determining that the opinions of KYS's expert witnesses were unreliable.  Summary judgment was also granted because KYS failed to establish sufficient proof of an antitrust injury.  For the reasons set forth below, we **AFFIRM** the judgment of the district court.

**I.  BACKGROUND**

**A.     Factual background**

*1.     NASCAR*

NASCAR races are among the most popular sporting events in the country. Organized in 1948, NASCAR grew from humble beginnings by racing cars at Daytona Beach, Florida.  Today, NASCAR sanctions races at 120 tracks in 38 states and abroad. The company is privately owned by the France family, including James France and his niece, Lesa France Kennedy.  Another member of the France family, Bill France, Jr., served as the Chairman and CEO of NASCAR until 2004.

NASCAR is in the business of sanctioning races.  "Sanctioning" is the process of organizing and staging a race, including the selection of venues, picking drivers, and setting the rules.  NASCAR-sanctioned races are highly coveted by the owners of

racetracks around the country due to the consistently high quality and profitability of these events.

But not all NASCAR events are created equal. One kind of event is prized by racetrack owners above all others: a NASCAR Sprint Cup race. (Sprint became the sponsor of this racing series in 2008; immediately prior to 2008 the series was sponsored by Nextel.) This racing series is widely considered to be the "major leagues" of stock-car racing. All other stock-car events, like the NASCAR-sanctioned Busch series, are analogous to the minor leagues. In terms of market share, KYS alleges that NASCAR owns a 100% share of the premium-stock-car race-sanctioning market (the Sanctioning Market). We will assume that this allegation is true for the purposes of this opinion.

Not every racetrack capable of hosting a Sprint Cup race, however, can obtain one. This is because NASCAR selects locations for Sprint Cup races based on a number of factors, including the condition of the facility, the market area (*e.g.*, whether the area has a history of supporting motor sports and whether it is a promising area for expansion), the competition schedule, the travel requirements for the race-car drivers and officials, weather conditions, the history of facility operations and management, the financial health of the facility, prior relationships with NASCAR, historical preservation, and NASCAR's long-term business goals.

### 2. ISC

There can be no Sprint Cup races—or any other races for that matter—without racetracks. Bill France, Sr. realized this and so, in 1953, incorporated ISC, the other defendant in this case. Over the years, ISC has raised funds through public offerings of its shares, which it has used to finance the acquisition and development of additional racing facilities. Although ISC is a public company subject to the oversight of ISC's Board of Directors, the France family retains control and has made all major decisions for the company, including but not limited to the selection of track locations, asset acquisitions, asset sales, and growth strategy—all of which ISC has disclosed in its filings with the Securities and Exchange Commission.

ISC sought to expand into new geographic markets and acquire and construct new venues beginning in the mid-1990s. Before 1996, ISC owned interests in four facilities that currently host Sprint Cup races. Between 1997 and 2004, ISC acquired ownership interests in eight additional venues, which also host the sought-after Sprint Cup races. Fifty-five percent of all Sprint Cup races are currently held at racetracks owned at least in part by ISC. The remaining 45% operate on independent tracks that are not parties in this case. Speedway Motorsports, Inc. ("SMI") is the only company other than ISC that owns more than one racetrack hosting a Sprint Cup race. KYS calls the market for hosting Sprint Cup races the "Hosting Market." Again, for the purpose of this opinion, we will assume that this market definition is accurate.

In addition to acquiring ownership stakes in racing venues, ISC sought and obtained rights of first refusal from several independent racetracks already hosting NASCAR events. One such agreement gave ISC the right to be first in line to negotiate for the purchase of the Pocono Raceway in Long Pond, Pennsylvania if a third party contacted the owner seeking to purchase a share of the facility. According to ISC, "[t]hese agreements do not preclude another buyer from purchasing the facilities, they have never resulted in the purchase of a track by ISC, and [they] offer no guarantee that ISC will purchase or even bid on the track subject to that right." KYS has not contested this claim.

ISC does not impose any "exclusive dealing arrangement," which means that companies other than NASCAR have been permitted to sanction races at ISC's racetracks. One of ISC's corporate representatives has nevertheless conceded that ISC has the ability, hypothetically, to prevent sanctioning bodies other than NASCAR from running races on ISC's tracks by "denying access to our asphalt"—i.e., by simply declining to allow the alternative sanctioning body to use ISC's venues.

### 3.      *KYS and its racetrack*

As NASCAR's popularity surged in the 1990s, KYS's investors started planning the construction of a 1.5 mile racetrack in northern Kentucky.  Prior to KYS's completion, NASCAR warned KYS that the area surrounding Kentucky was saturated with Sprint Cup races held at facilities in Indianapolis, Indiana; Bristol, Tennessee; Talladega, Florida; and Richmond, Virginia.  Construction nevertheless continued.  In 1999, the racetrack was completed.

The KYS facilities have received rave reviews.  Even NASCAR's former Chairman Bill France, Jr. acknowledged that KYS did "everything right."  Echoing that praise, John Saunders, Chief Operating Officer and Executive Vice President of ISC, called KYS a "rock-solid asset."  Drivers have also praised the track.  Championship driver Darrell Waltrip, for example, said that he "never talked to a driver that didn't like the racetrack."

Attendance records bolster the claim that KYS's facility is first-class.  In June 2000, KYS hosted a Craftsman Truck Race.  Tickets sold out, luxury suites were full, and the race had a roster full of impressive sponsors.  Indeed, the Craftsman Truck race at KYS's facility continues to be among the best-attended in the Craftsman series nationwide.  Craftsman Truck races are NASCAR-sanctioned events.

Other racing events held at the racetrack have been similarly successful.  KYS hosted an Indy Racing League (IRL) race in 2000 and now regularly hosts IRL races. In 2001, KYS branched out and hosted a Busch-series race.  (Although Anheuser-Busch no longer sponsors this racing series, we will continue to refer to the series as the Busch series for the sake of simplicity.)  The 2001 Busch race sold out and was one of the highest-attended and highest-rated Busch races in the country.  KYS continues to host Busch-series races.  The Busch series is also sanctioned by NASCAR.

Despite this string of successes, KYS has failed to attract a race from the most profitable and high-profile racing series—the NASCAR-sanctioned Sprint Cup.  KYS

claims, in essence, that it built a major-league facility that has not been able to attract a major-league event.

### 4.        *Alleged anticompetitive conduct*

KYS blames its failure to obtain a Sprint Cup race on allegedly anticompetitive conduct by NASCAR and ISC, pointing to several alleged practices that purportedly show that NASCAR and ISC have colluded to shut out competition in the Sanctioning and Hosting Markets, respectively. These practices include acting jointly to set the NASCAR Cup schedule, to develop new markets, and to decide which tracks will host premium stock-car races.

KYS also complains about NASCAR's and ISC's practice of working together to obtain rights-of-first-refusal agreements from independent racetracks "for little or no consideration." These agreements allow ISC to be the first-in-line bidder for independent racetracks in the event that the owners of the racetrack express an interest in selling the same.

Two other NASCAR and ISC business practices, however, are particularly objectionable to KYS. First, NASCAR and ISC have purportedly conspired to increase ISC's share of the Hosting Market. For example, NASCAR allegedly refused to sanction a Sprint Cup race at the Homestead-Miami Speedway in Florida until ISC was permitted to purchase a major interest. KYS also claims that NASCAR threatened to pull Sprint Cup races from the Las Vegas Motor Speedway in Nevada unless ISC was allowed to purchase the facility. ISC has thus allegedly increased its share of the Hosting Market by using NASCAR's Sprint Cup series as a bargaining chip.

 Second, KYS asserts that NASCAR and ISC have enlisted at least one other independent racetrack—SMI—to help them dominate their respective markets. KYS has tried to obtain a Sprint Cup race by purchasing an independent racetrack that already has this race so that KYS can move the race to its northern Kentucky facility. But no independent track has agreed to sell, even though KYS has allegedly submitted good offers. Moreover, KYS alleged that ISC and SMI have agreed not to compete with each

other in the Hosting Market by, for example, entering into a joint venture to purchase Dover Motorsports, the owner of an independent speedway in Delaware, while KYS unsuccessfully sought to purchase the same company in order to secure a Sprint Cup race.

### 5.    *Injury*

The sole injury that KYS claims to have suffered is the failure to host a Sprint Cup race, which KYS contends has caused it a loss of at least $175 million. According to KYS, this injury flows from NASCAR's and ISC's anticompetitive conduct, calculated to drive independent racetracks like KYS out of the Hosting Market while preventing future businesses from challenging NASCAR's dominance in the Sanctioning Market.

### B.    Procedural background

Convinced that NASCAR's and ISC's conduct has been anticompetitive, KYS filed suit in the United States District Court for the Eastern District of Kentucky in July 2005, alleging that NASCAR and ISC violated Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1 and 2. KYS specifically alleged (1) unlawful monopolization of the Sanctioning Market by NASCAR under § 2, (2) illegal conspiracy in restraint of trade by NASCAR and ISC under § 1 (involving an alleged conspiracy between themselves and "other companies that control tracks hosting NASCAR-sanctioned events"), (3) conspiracy to monopolize the Hosting and Sanctioning Markets under § 2 (based on the same allegations as the § 1 conspiracy), and (4) attempted monopolization of the Hosting Market by ISC under § 2.

NASCAR and ISC filed separate motions to dismiss in September of the same year. In January 2006, the district court denied the motions, concluding that KYS had properly alleged antitrust claims. The court also noted, however, that "[i]t may well be that plaintiff's case will fail when scrutinized after discovery under the higher standards of proof that will prevail on summary judgment or at trial." *Ky. Speedway, LLC v. NASCAR, Inc.*, 410 F. Supp. 2d 592, 597 (E.D. Ky. 2006).

After discovery was complete, and after KYS filed a second amended complaint, NASCAR and ISC filed a joint motion for summary judgment in August 2007. The district court granted the motion in January 2008, holding that there was insufficient evidence supporting KYS's definitions of the Hosting and Sanctioning Markets because the reports and deposition testimony of KYS's experts could not withstand scrutiny under the Supreme Court test laid out in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Alternatively, the court concluded that KYS's suit was indistinguishable from a straightforward "jilted distributor" case, meaning that KYS could not survive summary judgment because KYS had failed to establish an antitrust injury. This timely appeal followed.

## II. ANALYSIS

### A.       Standards of review

As to the admissibility of expert testimony, this court applies the abuse-of-discretion standard. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001). "A district court abuses its discretion if it bases its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Brown v. Raymond Corp.*, 432 F.3d 640, 647 (6th Cir. 2005) (citation and internal quotation marks omitted).

With regard to the grant of summary judgment, we review the district court's decision de novo. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). In considering a motion for summary judgment, the district court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The central issue is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

**B.    Exclusion of expert testimony**

Turning now to the issues on appeal, KYS first argues that the district court erroneously excluded the testimony of its two key experts.  KYS's claims are governed by Rule 702 of the Federal Rules of Evidence, which controls the admissibility of all types of expert testimony.  The rule provides as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

According to *Daubert*, a district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand."  509 U.S. at 597.  The district court must consider "whether the reasoning or methodology underlying the testimony is scientifically valid."  *Id.* at 592-93.

As an initial matter, KYS urges us to review the district court's order de novo because of the court's alleged failure to perform its gate-keeping function.  De novo review, however, is  appropriate only where the district court excludes expert testimony on the basis of an incomplete record, or after conducting nothing more than a perfunctory review.  *See, e.g.*, *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 393 (6th Cir. 2000) (reversing under the de novo standard of review where the district court "prematurely" excluded experts' reports without conducting a *Daubert* hearing or allowing the parties to submit briefs); *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000) (reviewing de novo where "[t]here is not a single explicit statement on the record to indicate that the district court ever conducted any form of *Daubert* analysis whatsoever").  Because the district court's analysis in the present case does not suffer from these deficiencies, de novo review is inappropriate.

Regarding the district court's analysis, KYS contests the court's decision to exclude the expert opinions of Dr. Andrew Zimbalist and Dr. Keith Leffler. KYS argues that Zimbalist used several reliable and well-accepted methods that pass muster under *Daubert* and other caselaw for defining the relevant markets. As for Leffler, KYS contends that the court erroneously determined that his opinions relied entirely on Zimbalist's definition of the relevant markets, when in fact Leffler's views regarding NASCAR's and ISC's allegedly anticompetitive conduct should survive even if Zimbalist's opinions are excluded. We will discuss each exclusion in turn.

### 1.     Dr. Zimbalist

Dr. Zimbalist was hired by KYS primarily to define the relevant markets in this case—the Sanctioning Market and the Hosting Market. But he also opined on the question of whether NASCAR's and ISC's conduct was anticompetitive in nature, concluding that their practices did in fact have anticompetitive consequences.

The district court struck Zimbalist's report and deposition testimony because he had included only Busch series and open-wheeled races as possible substitutes for attending live NASCAR stock-car racing events or watching them on television. It concluded that Zimbalist should have considered other sports—and possibly other forms of entertainment—as substitutes. Furthermore, the court concluded that the SSNIP test (which stands for "Small but Significant Non-transitory Increase in Price") Zimbalist used to define the markets did not meet the *Daubert* criteria. Specifically, the court found that Zimbalist "used his own version" of the test, a version that had not been tested, had not been subjected to peer review, had no controlling standards, had no demonstrable showing of support within the scientific community, and was produced solely for purposes of the instant litigation. Our independent review of the record convinces us that the district court did not abuse its discretion in so ruling.

KYS bears the burden of defining "the relevant market within which the alleged anticompetitive effects of [NASCAR's and ISC's] actions occur." *See Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2004) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.")

(quoting *NHL Players' Assoc. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003) (citations and internal quotation marks omitted)). To determine this relevant market, "no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that part of the trade or commerce, monopolization of which may be illegal." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).

A relevant market consists of both a geographic component and a product component. *NHL Players' Assoc.*, 325 F.3d at 719. When analyzing the latter, this court has found the "reasonable interchangeability" standard to be "[t]he essential test for ascertaining the relevant product market." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). "Reasonable interchangeability" is assessed by considering (1) product uses (whether substitute products can perform the same function) and/or (2) consumer response (also known as "cross-elasticity"), defined as "consumer sensitivity to price levels at which they elect substitutes for the defendant's product or service." *Worldwide Basketball*, 388 F.3d at 961 (citations omitted).

In construing the Sanctioning Market, Zimbalist posited that NASCAR receives revenue from ticket and concession sales, licensing fees, sponsorship monies, and broadcast monies. Zimbalist further determined that NASCAR is the sole supplier of a "product" (the Sprint Cup races) of which fans, television stations, corporations, and the motorsports radio network are consumers. But despite evidence that NASCAR competes with various forms of entertainment—including other stock-car and open-wheel racing, other professional sports leagues, and recreational sports—Zimbalist identified only the Busch series and open-wheel racing series as possible substitutes. A substitutability analysis that encompasses all the alternative forms of entertainment is necessary in light of the fact that the consumers Zimbalist identifies have a variety of comparable "products" from which to choose. Corporate sponsors, for example, could choose to advertise their products in conjunction with another sporting event, and broadcasters could select non-auto racing programming, or non-sports programming altogether, in lieu of airing a Sprint Cup race.

Although we question whether Sprint Cup race fans should be deemed consumers in the Sanctioning Market—NASCAR, after all, does not sell tickets, and therefore ticket sales should not be included in NASCAR's revenue stream—they similarly face multiple choices in deciding whether to spend money to watch a race. As the district court noted, "a family [of four] might patronize a Bengals or Reds game or some other sports event, instead of a [Sprint Cup] race," if the price of Sprint Cup race tickets were raised. Appellate courts have also recognized the notion that a professional sport competes with other sports and other forms of entertainment. *See, e.g., Am. Needle, Inc. v. NFL*, 538 F.3d 736, 743 (7th Cir. 2008) ("[T]he [NFL] competes with other forms of entertainment for an audience of finite (if extremely large) size."); *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) (noting that the NBA competes with "other basketball leagues (both college and professional), other sports (Major League Baseball, college football), and other entertainments such as plays, movies, opera, TV shows, Disneyland, and Las Vegas") (internal quotation marks omitted).

KYS contends, however, that racetracks—rather than broadcasters, corporate sponsors, and fans—are the consumers in the Sanctioning Market, and that these tracks cannot switch to hosting another sporting event such as baseball or football. But this argument conflicts with Zimbalist's own deposition testimony that racetracks are *not* consumers in the Sanctioning Market. Zimbalist testified that "[racetracks] are not final consumers; they are inputs. They are purchasing the right to be—[o]r they're negotiating the right to be a part of the production process." We thus decline to critique the district court for failing to view Zimbalist's expert testimony from a perspective rejected by Zimbalist himself.

As with his analysis of the Sanctioning Market, Zimbalist did not evaluate a broader range of potential substitutes in the context of the Hosting Market. We therefore conclude that the district court's reasoning regarding the paucity of interchangeability analysis in Zimbalist's report was not erroneous.

In addition to finding that Zimbalist inadequately examined possible substitutes for the Sprint Cup races, the district court concluded that Zimbalist did not properly

perform the SSNIP test. This test measures whether increasing a product's price—usually by five percent—results in a substantial number of consumers purchasing an alternative product. The use of this technique has been recognized in antitrust caselaw, *see F.T.C. v. Whole Foods Mkt., Inc.*, 548 F.3d 1028, 1038 (D.C. Cir. 2008) (recognizing the SSNIP test as a valid diagnostic tool), and the district court found that the parties in this case agreed that it is "an accepted means of analyzing the interchangeability of a product and its substitutes."

By his own admission, Zimbalist did not perform the standard SSNIP test. Rather than analyzing whether a price increase at a particular point in time would result in consumer substitution of an alternative product, Zimbalist looked at average Sprint Cup ticket prices and attendance figures over an eight-year span and concluded that both price and demand increased in this time period. The district court properly characterized this analysis as Zimbalist's "own version" of the SSNIP test and noted that "[i]t has not been tested; has not been subjected to peer review and publication; there are no standards controlling it; and there is no showing that it enjoys general acceptance within the scientific community. Further, it was produced solely for this litigation." We find this analysis persuasive. The district court therefore did not abuse its discretion in discrediting Zimbalist's SSNIP test.

But KYS argues that the district court's ruling wrongly forces parties to use the standard SSNIP test as the "sole methodology for judging a relevant market" and excludes consideration of other acceptable methods. Specifically, KYS notes that Zimbalist primarily relied on the "practical indicia" factors laid out in *Brown Shoe Co. v. United States*, 370 U.S. 294, 325 (1962). These factors include "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.*

Contrary to KYS's contention, however, these practical indicia come into play only after the "outer boundaries of a product market are determined" by evaluating "the reasonable interchangeability of use or the cross-elasticity of demand between the

product itself and substitutes for it." *Id.* Once the contours of the "broad market" are defined, practical indicia are then employed to determine whether "well-defined submarkets" exists. *Id.* This court has rejected the notion that "market and submarket analyses are substitute tests." *White & White, Inc. v. Am. Hosp. Supply Corp.*, 723 F.2d 495, 500 (6th Cir. 1983). Rather, the reasonable-interchangeability analysis is the "essential test for ascertaining the relevant product market." *Id.*

Submarket criteria, by contrast, are "to be used in conjunction with the basic test to more precisely define the relevant markets." *Id.* (holding that the district court's "fundamental error . . . was the mistaken premise that standard market tests may be abandoned or ignored and replaced with a less demanding 'submarket test'"); *see also Worldwide Basketball & Sport Tours, Inc. v. NCAA*, 388 F.3d 955, 962 (6th Cir. 2005) ("[A] submarket analysis incorporates, but does not replace, the standard market test. It merely adds new factors to that test so as to more precisely define the market affected by the defendant's actions.") (citations omitted).

Equally unpersuasive is KYS's argument that Zimbalist looked to barriers to entry and anticompetitive conduct as additional indicia to define the relevant markets. Not only did KYS fail to raise this argument in the district court, it has not cited any authority for the proposition that these factors can *define* (rather than simply reinforce) a market definition. *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 206 (2d Cir. 2001) (holding that a showing of anticompetitive conduct "is a strong indicator of market *power*") (emphasis added).

In light of these deficiencies, the district court excluded Zimbalist's expert report and deposition testimony as being unreliable under *Daubert*. We find no abuse of discretion regarding that ruling.

### 2. *Leffler*

The district court also excluded Leffler's expert report and deposition testimony because he based his opinions on Zimbalist's market analysis. Given Leffler's statement in his report that he "concur[s] in Dr. Zimbalist's opinions concerning market

definitions," and the fact that Leffler conducted no interchangeability analysis of his own, we again find no abuse of discretion with regard to the district court's ruling.

**C.    Lack of expert testimony**

KYS alternatively asserts that, contrary to the district court's opinion, KYS can prove the relevant markets in the absence of expert testimony from either Zimbalist or Leffler. Our sister circuits have disagreed as to whether expert testimony is necessary to establish a relevant market. *Compare Lantec v. Novell*, 146 F. Supp. 2d 1140, 1147-48 (D. Utah 2001), *aff'd*, 306 F.3d 1003 (10th Cir. 2002) (rejecting an Eleventh Circuit rule that a relevant market must be established using expert testimony), *with Colsa Corp. v. Martin Marietta Servs., Inc.*, 133 F.3d 853, 855 n.4 (11th Cir. 1998) (holding that "construction of a relevant economic market or a showing of monopoly power in that market cannot be based upon lay opinion testimony") (citation, alterations, and internal quotation marks omitted).

This court has not yet weighed in on the issue. Suffice it to say, however, that what KYS proposes to use in place of expert testimony—namely lay testimony and internal NASCAR marketing documents—does not provide a sound economic basis for assessing the market for Sprint Cup races the way that a proper interchangeability test would. In short, without Zimbalist's testimony, KYS lacks the ability to define the relevant markets necessary to succeed on its claims. *See Verizon Commc'ns., Inc. v. Law Offices of Curtis Trinko, LLP*, 540 U.S. 398, 407 (2004) (holding that a claim under Section 2 of the Sherman Act requires "the possession of monopoly power in the *relevant market*") (emphasis added); *Worldwide Basketball*, 388 F.3d at 959 (listing the requisite elements for a claim under Section 1 of the Sherman Act, the second being unreasonable restraint of trade "in the *relevant market*") (emphasis added); *see also NHL Players' Assoc. v. Plymouth Whalers Hockey Club*, 325 F.3d 712, 719-20 (6th Cir. 2003) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim.").

**D.  Additional challenges faced by KYS**

In addition to the inadmissibility of its proposed expert testimony, KYS faces other hurdles in prevailing on its antitrust claims.  It would, for example, need to demonstrate that NASCAR and ISC are legally capable of conspiring with each other.  Courts have barred antitrust actions against companies under common ownership or companies that exhibit a unity of interest.  *See Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771 (1984) (holding that a parent and a wholly owned subsidiary have a "complete unity of interest" because "their objectives are common" and "their general corporate actions are guided or determined not by two separate corporate consciousnesses, but one"); *Guzowski v. Hartman*, 969 F.2d 211, 214 (6th Cir. 1992) (concluding that two horse-racing tracks, despite being owned by separate corporations, were a "single economic unit" because the shareholders of the corporation were identical); *Zachair Ltd. v. Driggs*, No. 97-1811, 1998 WL 211943, at *2 (4th Cir. April 30, 1998) (affirming a district court's dismissal of an antitrust claim because the "[p]lain language of the complaint allege[d] that the corporate defendants were all controlled and/or owned by" the same person); *Livingston Downs Racing Ass'n, Inc. v. Jefferson Downs Corp.*, 257 F. Supp. 2d 819, 835 (M.D. La. 2002) (finding no antitrust violation between competing racetracks where a husband and wife wholly owned one and held 72% of the voting stock in the other because "there can be no § 1 conspiracy between one corporation and another corporation that it legally controls").  KYS would thus need to show that despite having overlapping ownership, NASCAR (wholly owned by three members of the France family) and ISC (of which the France family owns 65% of the voting stock and for which the family makes all of the major decisions) are not under common ownership or control and do not share a single "corporate consciousness."

Another hurdle faced by KYS is its need to show that its failure to obtain a Sprint Cup race constitutes an antitrust injury, "which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *See Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).  An injury does "not qualify as 'antitrust injury' unless it is attributable to an anti-

competitive aspect of the practice under scrutiny." *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990). "The Sixth Circuit, it is fair to say, has been reasonably aggressive in using the antitrust injury doctrine to bar recovery where the asserted injury, although linked to an alleged violation of the antitrust laws, flows directly from conduct that is not itself an antitrust violation." *Valley Prods., Inc. v. Landmark*, 128 F. 3d 398, 403 (6th Cir. 1997).

We question KYS's allegation that NASCAR's refusal to grant KYS a Sprint Cup race constitutes an antitrust injury because there are many considerations relevant to the quintessential business judgment of whether expanding the Sprint Cup to northern Kentucky makes economic sense in developing the NASCAR brand on a national basis. *See Expert Masonry, Inc. v. Boone County, Ky.*, 440 F.3d 336, 347 (6th Cir. 2006) (explaining that "whether the parties exercise wise business judgment in any given transaction is not a concern of antitrust laws"). KYS has also failed to put forth persuasive evidence that NASCAR and ISC are colluding to drive KYS out of business, especially in light of the healthy source of revenue that KYS reaps from NASCAR continuing to sanction both the Craftsman Truck races and the Busch series at the KYS facility.

Likewise, KYS's contention that its inability to purchase an independent racetrack because NASCAR, ISC, and SMI have colluded against it is unsupported by the record. KYS does not appear to have been hampered in its efforts to bid for an independent track, and even if KYS should have won the bid, antitrust law does not require that sellers of independent tracks make good business decisions. *See id.* (observing that "sellers are free to choose to whom they will sell, and salesmen battle and strive to curry favor and close the deal; whether the parties exercise wise business judgment in any given transaction is not a concern of the antitrust laws").

In this regard, there is a serious question as to whether KYS is simply a "jilted distributor" that NASCAR bypassed as a host for a Sprint Cup race in favor of its competitors. *See, e.g.*, *Care Heating & Cooling, Inc. v. Am. Standard, Inc.*, 427 F.3d 1008, 1014-15 (6th Cir. 2005) (holding that a "manufacturer has a right to select its

customers and refuse to sell its goods to anyone, for reasons sufficient to itself") (internal quotation marks omitted) (quoting *Dunn & Mavis, Inc. v. Nu-Car Driveaway, Inc.*, 691 F.2d 241, 243 (6th Cir. 1982)). These cases strike us as analogous to the circumstances faced by KYS in the present case, and they cast doubt on whether KYS's failure to obtain a Sprint Cup through NASCAR's application process is "an injury of the type the antitrust laws were intended to prevent." *See Brunswick Corp.*, 429 U.S. at 489.

We need not address these potential hurdles further, however, in light of our conclusion that the district court did not abuse its discretion in excluding the reports and deposition testimony of KYS's experts Zimbalist and Leffler. Without having defined the relevant markets, KYS is simply unable to sustain its antitrust claims.

## III. CONCLUSION

For all of the reasons set forth above, we **AFFIRM** the judgment of the district court.