NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0850n.06

No. 10-1555

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

ANDREW J. ISTVAN, Personal Representative
of the Estate of Andrew Jason Istvan, Deceased,

     Plaintiff,

v.

HONDA MOTOR COMPANY, LTD..;
HONDA R&D COMPANY LIMITED;
AMERICAN HONDA MOTOR CO., INC.; and
AMERICAN HONDA INCORPORATED,

     Defendants.

_____/

FILED

Dec 16, 2011

LEONARD GREEN, Clerk

ON APPEAL FROM THE UNITED
STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

BEFORE:    MERRITT, CLAY, and SUTTON, Circuit Judges.

    **CLAY, Circuit Judge.** In this diversity case governed by 28 U.S.C. § 1332, plaintiff Andrew J. Istvan, personal representative of his son's estate, appeals an order granting summary judgment in favor of the defendants (collectively "Honda") on Istvan's negligent manufacture and breach of warranty claims. Because Istvan failed to create a genuine issue of material fact on several elements of his claims, we **AFFIRM**.

STATEMENT OF FACTS

Samir Raval bought a 2002 Honda CBR954RR motorcycle in May 2002. Roughly one year later, Raval sold it to the decedent, Andrew Jason Istvan. Shortly after Istvan's purchase, a Michigan service technician completed a product update on Istvan's CBR954RR, which included new steering bearings aimed at improving the motorcycle's steering balance.

At roughly 9:00 p.m. on June 11, 2005, the decedent and his friend, Jonathan O'Neill, were riding their motorcycles southbound on Brigden Road in Sarnia, Ontario, Canada. At some point, the decedent's front tire began wobbling. O'Neill, who was riding a head of the decedent and on the right side of the same lane, slowed his motorcycle and watched the decedent pull his bike to the right side of the road. The decedent's motorcycle then rode into a ditch adjacent to the road and flipped end-over-end several times. The decedent was thrown from the motorcycle and suffered fatal injuries.

In a police report prepared shortly after the crash, O'Neill said he saw the front tire begin to wobble while he was looking in his rear view mirror. O'Neill signed the police statement, but the body of the statement was not written in O'Neill's handwriting. In a second statement he gave to police five days later, O'Neill said that he saw the decedent's front tire begin to wobble when he looked into his mirror and then back over his shoulder. O'Neill testified identically in his deposition. O'Neill also discounted the possibility that the decedent rode his motorcycle hazardously leading up to the accident. Having ridden with the decedent four or five times before, O'Neill testified that he never saw the decedent do a "wheelie" or an "endo" or otherwise take any serious risks.[1]

---

[1] An "endo" refers to a maneuver in which a rider abruptly brakes his motorcycle and lifts up the back wheel, in order to balance on his front wheel.

Istvan offered Pedro Gregorio as an expert to testify that the CBR954RR was not reasonably safe and that an alternative design was feasible. Gregorio obtained a master's degree in mechanical engineering from the University of Michigan in 1991, with a focus on automotive engineering, and has worked as a freelance writer for a magazine entitled *Midwest Motorcyclist* since 2000. In his deposition, Gregorio theorized that the CBR954RR's "steering geometry" made the motorcycle vulnerable to "steering oscillations," which in turn could cause an operator to lose control of his motorcycle. Gregorio also suggested that the installation of a steering damper would have reduced the tendency of the CBR954RR's steering system to oscillate. A steering damper is a device, akin to a shock absorber installed on an automobile, designed to prevent a motorcycle's front wheel from oscillating left or right when traveling over unstable road conditions.

The district court decided that Gregorio's testimony was unreliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and concluded that Istvan failed to raise a genuine issue of fact regarding the essential elements of defect, alternative design, and causation. The district court entered summary judgment and Istvan timely appealed.

## DISCUSSION

I.     **Exclusion of Plaintiff's Expert Witness**

      A.     **Legal Framework**

Istvan challenges the district court's decision to exclude Gregorio's testimony.[2] We review a district court's decision to exclude expert testimony for an abuse of discretion. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 258 (6th Cir. 2001). A district court abuses its discretion if its ruling stems from "an erroneous view of the law or a clearly erroneous assessment of the evidence." *Ky. Speedway, LLC v. Nat'l Ass'n of Stock Car Auto Racing, Inc.*, 588 F.3d 908, 915 (6th Cir. 2009) (internal quotation marks and citation omitted). We will only reverse for an abuse of discretion where we are left with "the definite and firm conviction that [the district court] committed a clear error of judgment in its conclusion." *In re Scrap Metal Litig.,* 527 F.3d 517, 528 (6th Cir. 2008) (internal quotation marks and citation omitted).

Istvan's six claims are species of Michigan's two most prominent products liability causes of action, negligent manufacture and breach of warranty. In a case like this one, in which a plaintiff alleges the same party both manufactured and sold the accused product, the elements of negligent manufacture and breach of warranty are "for all intents and purposes, identical." *Hollister v. Dayton Hudson Corp.*, 201 F.3d 731, 736–37 (6th Cir. 2000); *see Prentis v. Yale Mfg. Co.*, 365 N.W.2d 176, 186–87 (Mich. 1984). Istvan was required to demonstrate (1) that the product was not reasonably safe when it left the control of the manufacturer, and (2) that "a practical and technically feasible alternative production practice was available that would have prevented the harm without significantly impairing the usefulness or desirability of the product." *Hollister*, 201 F.3d at 738;

---

[2]Istvan also offered Dror Kopernik as an expert to testify to the CBR954RR's defective condition. The trial court excluded Kopernik's testimony as unreliable, a decision Istvan does not challenge on appeal.

*Croskey v. BMW of North America, Inc.*, 532 F.3d 511, 516 (6th Cir. 2008) (citing Mich. Comp. Laws § 600.2946(2)).

Michigan law requires the trier of fact to engage in a "risk-utility balancing test" in order to decide whether a product was defective. *Id.* The purpose of the risk-utility test lies in allowing the "jury to balance the magnitude of the risk versus the feasibility of other design alternatives, or otherwise to weigh the 'unreasonableness' of risks arising from the [design chosen]." *Miller v. Ingersoll-Rand Co.*, 148 F. App'x 420, 423 (6th Cir. 2005) (citing *Siminski v. Klein Tools, Inc.*, 840 F.2d 356, 358 (6th Cir. 1988)). Under the risk-utility test, the plaintiff must offer evidence demonstrating:

(1)     that the severity of the injury was foreseeable by the manufacturer;
(2)     that the likelihood of the occurrence of the injury was foreseeable by the manufacturer at the time of distribution of the product;
(3)     that there was a reasonable alternative design available;
(4)     that the alternative available design was practicable;
(5)     that the available and practicable reasonable alternative design would have reduced the foreseeable risk of harm posed by the defendant's product; and
(6)     that the omission of the available and practicable reasonable alternative design rendered the defendant's product not reasonably safe.

*Croskey*, 532 F.3d at 516 (internal quotations and citations omitted). An alternative design is practical and feasible only if the technical knowledge "relating to production of the product" was "developed, available, and capable of use in the production of the product and was economically feasible" at the time the product in question was manufactured. Mich. Comp. Laws § 600.2946(2). Either direct or circumstantial evidence suffices to support the risk-utility showings required to prove a design defect. *Croskey*, 532 F.3d at 516.

A plaintiff may offer proof of the risk-utility factors by way of expert testimony. *Id.*; *Lawrenchuk v. Riverside Arena, Inc.*, 542 N.W.2d 612, 614–15 (Mich. Ct. App. 1995). Expert testimony offered to this effect must satisfy Federal Rule of Evidence 702 and *Daubert*. *Daubert* requires trial judges to act "as gatekeepers to exclude unreliable evidence." Fed. R. Evid. 702 advisory committee's note. A trial court must be satisfied that a proffered expert is qualified to testify on the technical subject matter at issue and his technical analysis is sufficiently reliable to assist the trier of fact in disposing of the relevant issues. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008). To this end, while not limiting the admission of relevant evidence, the trial court must ensure that an expert uses in the courtroom the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009) (quoting *Kumho Tire Co.*, 526 U.S. at 152). A trial court's assessment of an expert's testimony is limited "solely [to] principles and methodology," so "the conclusions they generate" should not affect the court's conclusion. *Daubert*, 509 U.S. at 594–95.

**B. Analysis**

Istvan offered Gregorio's testimony to prove a defect in the CBR954RR's design and the feasibility of an alternative design. Gregorio's report and testimony, however, suffer from several defects. The most glaring problem with Gregorio's testimony is its lack of evidentiary support. Gregorio opined that the CBR954RR was designed with a "specific steering geometry that made it more sensitive to steering oscillations." When counsel pressed Gregorio to offer reasons for his opinion grounded in engineering science, Gregorio demurred and explained that he relied on his "general knowledge of motorcycle design" and his racing experience for support. Only in general

terms did Gregorio opine that increasing the rake and trail of the CBR954RR would have decreased the likelihood of steering oscillation, but he further pointed out that this adjustment "always increases stability."[3]

Gregorio missed an opportunity to support his opinion, because he examined neither the accident vehicle nor the extensive records Honda produced of the tests it performed on the 2002 CBR954RR in formulating his opinion. He performed no tests on the CBR954RR, and he was unaware of any other engineers who had. In fact, he had only operated the CBR954RR once, and he was unsure whether the motorcycle he rode was fitted with a steering damper. Therefore, Gregorio was unqualified to render any opinion on how the installation of a steering damper affected the CBR954RR's performance.

Instead, Gregorio relied on his experience of operating motorcycles for enjoyment and his observation that most other motorcycles released in the 2002 model year were fitted with steering dampers. He opined that steering oscillations could occur on a motorcycle not fitted with a steering damper at a speed of roughly seventy miles per hour. In support of this opinion, Gregorio cited an episode in which a 1994 Honda motorcycle he was riding began to wobble. He later explained that the motorcycle wobbled only after he installed a trunk on the bike. Given his insubstantial basis of information, Gregorio could not explain with technical detail how a steering damper would have

---

[3]The "rake" is the angle, measured from a ninety-degree vertical line, of the forks that form the motorcycle's steering axis. The "trail" is the distance on the ground created by the intersection of two lines—the first running vertically from the front wheel axle, and the second running from the angle of the forks.

improved the CBR954RR's performance. The support for Gregorio's opinion was merely anecdotal, which is plainly not befitting of an expert's opinion.

Perhaps as a result of his shallow well of knowledge on the subject, Gregorio even equivocated about the value of a steering damper. Noting that a steering damper would lead to a "trade-off between stability and ease of steering," Gregorio implied that the installation of a steering damper remained within the manufacturer's discretion. He further conceded that a steering damper would be of little help if steering oscillations occurred on a motorcycle traveling well over seventy miles an hour. All told, even Gregorio's unsupported opinion provided no more than feeble support for the contention that a steering damper would have remedied any defect in the CBR954RR's performance.

## III. Summary Judgment and Plaintiff's Motion for Leave to Supplement Opposition

Largely on the basis of the deficiencies in Gregorio's testimony, the district court granted summary judgment in favor of Honda. We review this decision *de novo*. *Wimbush v. Wyeth*, 619 F.3d 632, 636 (6th Cir. 2010). A moving party is entitled to summary judgment if the pleadings, the discovery and the disclosure materials on file, and any affidavits "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There exists no genuine issue of fact where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In considering a summary judgment motion, all inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. *Id.* The opposing party must present more than a "scintilla" of evidence; the evidence must be such that

a reasonable jury could find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

The remaining evidence Istvan produced could not have led a rational trier of fact to conclude that the CBR954RR's design was defective. Dror Kopernik, Istvan's second expert, refused to opine on whether the motorcycle was defective, stating that he lacked information sufficient to make such a judgment. Honda's expert, Kris Kubly, found that the rear swing arm in the decedent's motorcycle was loose and claimed that the collision caused the looseness. For his part, Kopernik declined to opine on another cause for the looseness. Istvan offered a March 2002 review of the CBR954RR published in a magazine entitled *Motorcyclist*. The article's author suggests that the CBR954RR might benefit from a steering damper, but only if the rider plans to operate the motorcycle at a speed considerably higher than the speed at which Istvan contends the decedent was riding before the crash.[4] The *Motorcyclist* review is, at best, mildly probative of the likelihood that the CBR954RR was defectively designed, and the article falls well short of the evidence Istvan needed to demonstrate that the motorcycle was not reasonably safe when it left Honda's control. *Hollister*, 201 F.3d at 738.

---

[4]In pertinent part, the article explained that:

> [h]ard on the gas out of one particular uphill, second-gear left-hander, the CBR would crest the brown and give a violent *snap-snap-snap* of its bars every lap—unless I hauled myself forward to keep more weight over the front wheel. (One or two riders felt the bike needed a steering damper, but [Honda designer Tadao] Baba thinks it's fine without one unless you're racing, and I'm inclined to agree.)

*Motorcyclist* Article 35–36, Pl.'s Resp. to Mot. for Sum. J. Ex. 3, Dist. Ct. R. 44.

Without any expert opinion to support any elements of his claims, Istvan attempted to rely on Honda's expert, Osamu Kikuchi. Several months after the parties finished briefing and arguing Honda's motion for summary judgment, Istvan requested leave to supplement his opposition to Honda's motion with material from Kikuchi's deposition testimony. Istvan's motion for leave failed to detail the testimony Kikuchi provided and specify how that testimony would influence the court's judgment, leaving the court to speculate about what a supplemental response would add to its decision making. Lacking information to evaluate the persuasiveness of the evidence Istvan sought to put in front of the court, the motion was denied.

Istvan first contends that Federal Rule of Civil Procedure 15(d) required the district court to grant him leave to amend his opposition to Honda's motion for summary judgment. Rule 15(d) applies only to pleadings, and, even with respect to pleadings, it leaves the decision to grant a party leave to amend within the district court's discretion. *Leisure Caviar, LLC v. U.S. Fish and Wildlife Serv.*, 616 F.3d 612, 615 (6th Cir. 2010).

Istvan also argues that Eastern District of Michigan Local Rule 7.1(g) required the district court to grant him leave to supplement his brief in response to Honda's motion for summary judgment. We disagree. Rule 7.1(g) allows a party to move for permission to file "additional affidavits or other documents in support or opposition" and states that the court "may" grant the motion. E.D. Mich. LR 7.1(g) (formerly Local Rule 7.1(f)). District courts in the Eastern District of Michigan have construed Rule 7.1(g) to allow themselves discretion in deciding whether to accept supplemental evidence. *See Midwest Guaranty Bank v. Guaranty Bank*, 270 F. Supp. 2d 900, 918 (E.D. Mich. 2003); *Anderson v. City of Monroe*, Case No. 05-CV-70255, 2006 WL 2077596, at *5

(E.D. Mich. July 24, 2006). This construction of Rule 7.1(g) does not conflict with the Federal Rules. Construing the rule to allow a court discretion in deciding a request to expand the record is consistent with a trial court's power to "manage its docket,"which we have traditionally permitted district courts "broad discretion" in doing. *ACLU v. McCreray Cty.*, 607 F.3d 439, 451 (6th Cir. 2010). Under the circumstances present here, the district court did not abuse that discretion by denying Istvan leave to argue that Kikuchi's deposition supported his opposition to summary judgment.

Istvan believes that the denial of the motion to supplement was unfair, but we disagree. The district court permitted the parties nine months for discovery, during which Istvan had ample time to prepare his own expert witnesses. In response to Honda's assertion that no genuine issue of fact remained for the court's adjudication on the elements of Istvan's negligence and warranty claims, it was incumbent on Istvan to provide the court with "specific facts showing that there [was] a genuine issue for trial." *Matsushita Elec. Indus. Co.*, 476 U.S. at 587. Only when it appeared the district court might exclude Istvan's own expert pursuant to *Daubert* did Istvan seek to rely on Kikuchi's testimony. Since the denial of Istvan's motion for leave did not deprive him of the opportunity to oppose Honda's motion, and because Istvan was afforded ample opportunity to identify his own expert witnesses, the district court did not abuse its discretion in denying Istvan leave to supplement his opposition.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's judgment.