RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 14a0277p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CASEY WILLIAM HYLAND, et al.,

*Plaintiffs*,

CHRISTOPHER R. BURNETTE; MYSTIC
BURNETTE,

*Plaintiffs-Appellants*,

*v.*

HOMESERVICES OF AMERICA, INC.;
HOMESERVICES OF KENTUCKY, INC.;
SEMONIN REALTORS; RECTOR-HAYDEN
REALTORS; MCMAHAN COMPANY, INC., d/b/a
Coldwell Banker MacMahan Company,

*Defendants-Appellees*.

No. 12-5947

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 3:05-cv-00612—Thomas B. Russell, District Judge.

Argued: March 18, 2014

Decided and Filed: November 13, 2014

Before: COLE, Chief Judge; NORRIS and GIBBONS, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Christopher Lovell, LOVELL STEWART HALEBIAN JACOBSON LLP,
New York, New York, for Appellants. Robert D. MacGill, BARNES & THORNBURG
LLP, Indianapolis, Indiana, for Appellees HomeServices of America. Matthew C.
Blickensderfer, FROST BROWN TODD LLC, Cincinnati, Ohio, for Appellee McMahan
Company **ON BRIEF:** Christopher Lovell, LOVELL STEWART HALEBIAN
JACOBSON LLP, New York, New York, for Appellants. Robert D. MacGill, Karoline
E. Jackson, BARNES & THORNBURG LLP, Indianapolis, Indiana, for Appellees
HomeServices of America. Matthew C. Blickensderfer, FROST BROWN TODD LLC,
Cincinnati, Ohio, for Appellee McMahan Company.

---

**OPINION**

---

ALAN E. NORRIS, Circuit Judge.  Class representatives Christopher and Mystic Burnette appeal three rulings by the district court that resulted in judgment for defendant real estate firms, all of which  operate in Kentucky.  The fourth amended complaint alleged that defendants violated Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, by participating in a horizontal conspiracy to fix the commissions charged in Kentucky real estate transactions at an anti-competitive rate.  The certified class consists of people who sold residential real estate in Kentucky from October 11, 2001, to October 11, 2005, and used the services of defendants.

Plaintiffs contend that the district court erred 1) by granting summary judgment to defendants; 2) by excluding the opinions of plaintiffs' experts with respect to the ultimate question of whether collusion among the defendants was the likely economic explanation of the pricing of commissions; and 3) by finding that defendant HomeServices of America, Inc., was not responsible for the acts of its subsidiary, HomeServices of Kentucky, Inc.

For the reasons that follow, we affirm the judgment of the district court.

**I.**

Plaintiffs filed suit in October 2005.  On November 7, 2008, the district court certified the class alluded to above.  We declined an invitation for interlocutory review of that order.

The crux of the allegation brought by plaintiffs is that defendants violated the Sherman Act by conspiring to charge a supra-competitive real estate broker commission of 6% and thereby injured sellers of residential property.

Several of the original named defendants have reached settlement agreements. The remaining defendants consist of the McMahan Company, Inc. (d/b/a Coldwell

Banker McMahan Co.) ("McMahan"); HomeServices of Kentucky, Inc. ("HSK"), which owns and operates Kentucky realtor defendants Semonin Realtors and Rector-Hayden Realtors; and HomeServices of America, Inc., ("HSA"), which is the parent company of HSK.

To become a real estate agent in Kentucky, an individual must be licensed by the Commonwealth's Real Estate Commission ("KREC"). Agents typically join local realtors' boards, such as the Greater Louisville Association of Realtors, the Lexington-Bluegrass Association of Realtors, and the Kentucky Association of Realtors ("KAR").

In 1991, the KREC passed a regulation (the "Rebate Ban") that prohibited licensed real estate brokers in Kentucky from offering any item or thing of value, including rebates, to induce clients to retain their services. The United States Department of Justice filed suit in 2005 against the KREC alleging that the Rebate Ban violated Section 1 of the Sherman Act.[1] That suit was settled and the Rebate Ban was abolished.

This action was filed shortly thereafter. The fourth amended complaint alleges that defendants "combined, conspired and agreed to fix, maintain and inflate real estate broker commissions and associated fees and refuse to compete on the basis of price." Specifically, defendants "have charged a real estate broker commission of 6%, have described this 6% fee as the 'standard' or 'typical' fee, and have habitually refused to negotiate a lower fee." According to the complaint, this collusion resulted in sellers being forced to pay artificially inflated commissions.

---

[1] The Section reads as follows:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding $100,000,000 if a corporation, or, if any other person, $1,000,000, or by imprisonment not exceeding 10 years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

The district court relied upon plaintiffs' expert, Dr. Gary French, to set out the elements of the alleged conspiracy:

> [T]he alleged conspiracy has two related elements: (1) fixing the buyer's broker commission at 3%; and (2) fixing the listing commission at a minimum of 6%. According to Dr. French, due to the visibility of the offered buyer's broker commission on the MLS [Multiple Listing Service], those listing brokers not offering at least 3% to a buyer's broker could be detected and policed. If a listing broker did not offer at least 3% to a buyer's broker, then a buyer's broker would not be interested in showing the property. . . . [T]he KREC Rebate Ban helped maintain commission rates at the conspiratorial standard during the Class Period by ensuring that Defendants did not cheat on their price-fixing agreement by providing a rebate or discount off of the stated fee.

District Court Memorandum Opinion at 2-3, filed July 18, 2012 (citations omitted).

The record developed below is voluminous and contains evidence that supports each side's claims. Plaintiffs point to a number of evidentiary items that they believe the district court improperly discounted. Unlike cases based solely upon circumstantial inferences, plaintiffs contend that direct evidence supports a conclusion that defendants actually agreed to fix prices. *See In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 627 (7th Cir. 2010) (Section 1 "does not require sellers to compete; it just forbids their agreeing or conspiring not to compete."); *see also Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999). In plaintiffs' view, they submitted extensive evidence of communications among defendants concerning breaches of the National Association of Realtors' rule regarding the ban against brokers discussing commission levels, pricing structures, or marketing practices of other brokers. Specifically, they refer to deposition testimony of principal brokers to the effect that realtors often discussed fees and commissions when they met.

In addition, plaintiffs point to a KREC hearing held on November 28, 2000, in Louisville. Among other things, Arvel "Jerry" McMahan, the principal broker for the McMahan Company, spoke about the dangers to the profession of internet brokers who offer cut-rate commissions. In his words, "the most unprofessional thing we can do in this business is cut our commission. I think we ought to be worth what we charge in the

services that we offer." Similar sentiments were expressed by a representative of Semonin. In plaintiffs' view, "[a] reasonable juror could easily find that the plain meaning of Defendants CBMcMahan's and Semonin/HSK's improper words reflected at the very least either (a) unity of purpose, or (b) a common design and understanding, or (c) a meeting of the minds, between Defendants CBMcMahan and Semonin not to cut commissions." Appellant Brief at 10 (emphasis omitted). In short, plaintiffs contend that they have produced direct evidence of price fixing in the form of the KREC hearing transcript.

In further support of that contention, they point to the complaint against the KREC filed by the Department of Justice challenging the Rebate Ban, in which the DOJ averred that the ban "enabled Brokers to raise, fix, peg, or stabilize the prices and rates at which Brokers are compensated. The Rebate Ban is the result of agreements, combinations, or conspiracies among its Commissioners and others, and it unreasonably restrains competition to the detriment of consumers." DOJ Complaint at ¶ 4. As already noted, this complaint resulted in the abolition of the Rebate Ban.

Plaintiffs paint the following general picture of the evolution of real estate commissions in Kentucky from the 1970s through the class period. During the 1990s, a shift occurred in the relationship between buyer's brokers and listing agents. Formerly, a buyer's broker was essentially a cooperating broker working with the listing agent. In the 1990s, however, a buyer's broker's role changed and he or she became a fiduciary of the buyer while the listing broker's allegiance was to the seller. Throughout both periods, the typical commission remained at 6% despite the fact that persons in other commission-driven occupations—e.g., travel agents and stockbrokers—saw their commissions erode. An MLS listing and other sale-related documents, such as a HUD-1 form, permitted realtors to determine commission levels, thereby allowing the industry to police those agents who might be providing rebates or other incentives to drum up business. This impetus manifested itself in the Rebate Ban. At bottom, plaintiffs' contention—supported by expert testimony, depositions, and documents—allegedly is that defendant firms colluded to keep commissions at an artificially inflated rate.

In response, defendant McMahan emphasizes that it considers itself a "full-service" real estate broker with eleven offices in Kentucky during the class period. In addition to listing property, it would suggest repairs to the owner in order to make the home more attractive, hold open houses, and engage in advertising efforts. Unlike a cut-rate internet broker, a full-service broker provided a wider range of services to the client, thereby justifying a higher commission. Principal agent Jerry McMahan oversaw the operation of the various offices, although the managing brokers in those locations had responsibility for the day-to-day operations.

According to McMahan, commissions derive from both the cost of doing business and historical context. In the past, the industry used a 6% commission for homes and a 10% commission for vacant land. This policy was not derived from consultation or agreement with other brokers. Agents with the firm were free to negotiate commissions outside of the standard 6% if the transaction merited. For instance, potential repeat customers might receive a favorable rate, as would those whose homes required some "wiggle room" in order to close the sale. Coldwell Banker, McMahan's owner, often approved those reduced commissions.

For its part, HSK notes that it, too, is a full-service brokerage firm that owns both Rector-Hayden and Semonin. Since 2003, it has done business in Louisville under the "Semonin" name and in Lexington as "Rector-Hayden." According to HSK, it needs to compete for the best agents and, in order to pay them accordingly, must generate maximum income from commissions. To refute a point made by plaintiffs, HSK argues that it must continue to pay buyer's brokers a commission of 3% or else risk losing them to listing agents who pay better commissions. However, HSK does not require its agents to charge the standard rate of 6%. Like McMahan, it will on occasion approve a commission under that rate for deal-specific reasons. Moreover, it does not share its internal pricing goals with other firms.

Finally, it contends that the real estate market is inelastic: homeowners do not decide to sell their homes based upon commission rates but on other factors. Thus, HSK cannot create more demand for its services by decreasing its commissions. Given this

consideration, there is no incentive for it to decrease its commission rate. In short, legitimate, non-collusive reasons govern the setting of commission rates in Kentucky.

**II.**

*1. Did the District Court Err in Granting Summary Judgment?*

*A. Standard of Review*

The rule governing whether summary judgment is appropriate is familiar: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We review the grant of summary judgment de novo, but draw all reasonable inferences in favor of the non-moving party. *Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 535-36 (6th Cir. 2014). That said, if the non-moving party is unable to present sufficient evidence to permit a reasonable jury to find in its favor, summary judgment is appropriate. *Id.* at 536 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

In this case, plaintiffs contend that the district court erroneously held them to a heightened standard by misreading *Matsushita Electrical Industrial. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Indeed, in its discussion of the circumstantial evidence presented by plaintiffs, the district court noted that a "stringent" summary judgment standard is appropriate in Section 1 Sherman Act cases. Mem. Op. at 39 (Page ID 21942). In *Matsushita* the Supreme Court provided us with the following guidance:

> To survive petitioners' motion for summary judgment, respondents must establish that there is a genuine issue of material fact as to whether petitioners entered into an illegal conspiracy that caused respondents to suffer a cognizable injury. This showing has two components. First, respondents must show more than a conspiracy in violation of the antitrust laws; they must show an injury to them resulting from the illegal conduct. . . .
>
> Second, the issue of fact must be "genuine." Fed. Rules Civ. Proc. 56(c), (e). When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken

as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

It follows from these settled principles that if the factual context renders respondents' claim implausible–if the claim is one that simply makes no economic sense–respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary. . . .

Respondents correctly note that "[o]n summary judgment the inferences to be drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." But antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case. Thus, in *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 104 S. Ct. 1464, 79 L. Ed. 2d 775 (1984), we held that conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy. *Id.*, at 764, 104 S.Ct., at 1470. To survive a motion for summary judgment or for a directed verdict, a plaintiff seeking damages for a violation of § 1 must present evidence "that tends to exclude the possibility" that the alleged conspirators acted independently. Respondents in this case, in other words, must show that the inference of conspiracy is reasonable in light of the competing inferences of independent action or collusive action that could not have harmed respondents.

*Matsushita,* 475 U.S. at 585-88 (citations and footnotes omitted).

In *Spirit Airlines v. Northwest Airlines, Inc.*, we acknowledged that the Supreme Court had observed that summary judgment is "appropriate where the antitrust claim simply makes no economic sense," but went on to note that *Matsushia* "does not increase the non-movant's burden on a motion for summary judgment." 431 F.3d 917, 930-31 (6th Cir. 2005) (quotation omitted). Moreover, we have recently cautioned that summary judgment is generally discouraged in the antitrust context "due to the critical 'role that intent and motive have in antitrust claims and the difficulty of proving conspiracy by means other than factual inference.'" *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 270 (6th Cir. 2014) (quoting *Expert Masonry, Inc. v. Boone Cnty., Ky.*, 440 F.3d 336, 341 (6th Cir. 2006)).

While courts must continue to construe facts in favor of the non-movant, even in the antitrust context, they cannot ignore the clear teaching of *Matsushita* that "conduct as consistent with permissible competition as with illegal conspiracy does not, standing alone, support an inference of antitrust conspiracy." *Matsushita*, 475 U.S. at 588 (citing *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 764 (1984)). Moreover, we have echoed that teaching: "[C]ircumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct. . . . [It] must tend to exclude the possibility of independent conduct in order that an antitrust claim survive summary judgment." *Re/Max Int'l, Inc. v. Realty One, Inc.*, 173 F.3d 995, 1009 (6th Cir. 1999).

Although the district court's allusion to a "stringent" summary judgment standard in the antitrust context is imprecise, we are not overly troubled by the use of the adjective in the course of a lengthy opinion. Rather, we now turn to ask, in the course of our de novo review of its opinion, whether it applied the correct legal standard set out in *Matsushita*, *Re/Max International*, and *Spirit Airlines* in reaching its decision. For the reasons outlined below, we conclude that it did.

### B.  The District Court's Reasoning

#### i. Basic Legal Concepts

The district court noted that the existence of an agreement is the hallmark of a Section 1 Sherman Act claim. Mem. Op. at 5 (quoting *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999), (Page ID 21908). This agreement, in turn, can be found when the conspirators have a unity of purpose, common understanding, or a "meeting of minds in an unlawful arrangement." *Am. Tobacco Co. v. United States*, 328 U.S. 781, 810 (1946).

Antitrust cases under Section 1 involve two modes of analysis depending on the nature of the claim. The "rule of reason" governs most allegations of restraints on trade. Under this analysis the court evaluates specific information about the industry, "its condition before and after the restraint was imposed, and the restraint's history, nature,

and effect." *In re Cardizem CD Antitrust Litig.*, 332 F.3d at 906 (quotation omitted).  A "restraint" is unlawful it if is "unreasonable."  *In re Se. Milk Antitrust Litig.,* 739 F.3d at 270. In some cases, however, those restraints "are deemed unlawful *per se* because they have such predictable and pernicious anticompetitive effect, and such limited potential for procompetitive benefit."  *In re Cardizem CD Antitrust Litig.* 332 F.3d at 906 (quotation omitted). Horizontal price-fixing, which is alleged in this case, falls generally under the *per se* category.  *Nat'l Coll. Ass'n v. Bd. of Regents*, 468 U.S. 85, 100 (1984).

### ii. Evidence of Conspiracy

An antitrust conspiracy can be established by either direct or circumstantial evidence.  *Re/Max Int'l*, 173 F.3d at 1009.  We turn first, as did the district court, to plaintiffs' alleged direct evidence.

### a. Direct Evidence

The district court began its review of the evidence by noting that direct evidence in the Section 1 antitrust context "must be evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted."  *See In re Baby Food Antitrust Litig.*, 166 F.3d at 118.  In other words, direct evidence is "tantamount to an acknowledgment of guilt" while circumstantial evidence includes "everything else, including ambiguous statements."  *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 662 (7th Cir. 2002).

The district court turned first to the public hearing mentioned earlier that was held before the KREC on November 28, 2000.  Plaintiffs maintain that the transcript of this hearing represents direct evidence of illegal collusion.  The purpose of the hearing was ostensibly to share a survey of inducement laws in other states and to invite comments on the possible repeal of the KREC Rebate Ban. At the hearing, Ray Rector of Rector-Hayden expressed the opinion that the consumer pays for inducements in the form of higher fees or a decreased level of service.  Jerry McMahan spoke at greater length and, as discussed earlier, supported maintaining  commissions.  Doug Myers of

Semonin echoed these sentiments: "I'd like to see our competition based on our professional performance, not upon our brokerage fees. . . ." Broker Barbara Campbell, whose agency charged only a 4.5% commission, contended that her clients were contacted by brokers who would tell them that other realtors "would not show my clients' homes to their buyers so long as they continue to do business with Campbell Realty." Another broker, Steven Gavin, reported harassment for offering only 2% to the buyer's broker.

The district court assessed this evidence and concluded that it did not constitute "direct evidence that Defendants conspired to fix real estate commissions at a supra-competitive 6%." Mem. Op. at 13. The court observed that it had reviewed the transcript of the KREC meeting and found that plaintiffs have taken remarks made by individual realtors "out of context and construed them in a highly-strained manner." *Id.* at 14.

We agree with this assessment. Like the district court, we view Jerry McMahan's statements at the hearing as ambiguous at best and they therefore do not establish direct evidence of a conspiracy. McMahan was highlighting the fact that his "full-service" firm offered more to its clients than his internet rivals and thereby justified its higher commission rate. Also absent in the record is any comment by McMahan suggesting that brokers negotiate among themselves their respective commission rates. With respect to those who spoke about having undergone harassment for offering lower rates, the district court observed that these speakers are not parties to this action, nor did they implicate defendants. Furthermore, "[a] finder of fact would need to infer that a buyer's broker fee of 3% always resulted in a supra-competitive full commission rate of 6% and that these individuals were harassed for failing to set a full commission rate of 6%." Mem. Op. at 15.

In short, it is our assessment, consonant with that of the district court, that the "direct" evidence relied upon by plaintiffs falls far short of the standard that it be "explicit and require[] no inferences." *In re Baby Food Antitrust Litig.*, 166 F.3d at 118.

With that, we turn to the much closer issue of whether the proffered circumstantial evidence precludes summary judgment for defendants.

### b. Circumstantial Evidence

Evidence of "conscious parallelism," also referred to as "oligopolistic price coordination," can support such a claim based upon circumstantial evidence. *In re Baby Food Antitrust Litig.*, 166 F.3d at 121. As the district court put it, "When competitors in a [concentrated] market establish their prices, not by agreement, but rather in a consciously parallel fashion, this may provide probative evidence of an understanding between competitors to fix prices." Mem. Op. at 16 (citations omitted). However, that is not necessarily the case: "Because of their mutual awareness, oligopolists' decisions may be interdependent although arrived at independently." *Id.* (citation on omitted). Thus, "'[t]he law is settled that proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of rational, independent choice less attractive than that of concerted action.'" *Id.* (quoting *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 446 (3d Cir. 1977)).

This court has set out the following considerations, sometimes referred to as "plus factors," in determining when circumstantial evidence amounts to a finding of concerted action: 1) whether defendants' actions, if taken independently, would be contrary to their economic interests; 2) product uniformity; 3) whether the defendants have been uniform in their actions; 4) whether the defendants have exchanged or have had the opportunity to exchange information relative to the alleged conspiracy; and 5) whether the defendants have a common motive to conspire or have engaged in a large number of communications. *See Re/Max Int'l*, 173 F.3d at 1009; *Wallace v. Bank of Bartlett,* 55 F.3d 1166, 1168 (6th Cir. 1995). "However, circumstantial evidence alone cannot support a finding of conspiracy when the evidence is equally consistent with independent conduct." *Re/Max Int'l.,* 173 F.3d at 1009. The district court noted that these five factors are considered to discern whether the "supra-competitive

6% commission rate was conscious and not the result of independent business decisions." Mem. Op. at 17 (Page ID 21920).

The district court then reviewed evidence of parallel pricing behavior and the plus factors. It found them to be insufficient to withstand summary judgment. In reaching this conclusion, the court relied upon these conclusions:

o        "Plaintiffs' evidence of parallel pricing shows merely that each Defendant had a policy of charging a minimum commission of 6% and that each Defendant occasionally deviated from its respective policy for various reasons." Mem. Op. at 30 (Page ID 21933).

o        "The prevalence of the 6% rate, then, is just as consistent with independent pricing decisions. The existence of a conspiracy cannot be inferred solely on the basis that Defendants tended to charge the same amount for their services." Mem. Op. at 30-31 (Page ID 21933-34).

o        "The Sixth Circuit has unequivocally proclaimed that 'setting cooperative sales-commission rates is not price fixing: it has no relation to the amount charged to clients for an agent's service.' *Re/Max Int'l*, 173 F.3d at 1025. . . . Thus, even if it was necessary for a listing broker to offer a 3% buyer's broker commission to the cooperating broker as an incentive, the listing broker is free to charge his client 4%, 5%, 10%, or even 3% plus a flat fee as [plaintiffs' expert] Dr. Yavas has suggested may occur in a perfectly competitive market." Mem. Op. at 31-32 (Page ID 21934-35).

o        "Plaintiffs' experts and Defendants both agree that real estate brokerage services are inelastic in that the number of property listings does not respond to changes in commission rates. . . . Accordingly, evidence that Defendants have not decreased their commission rates is not evidence that they acted contrary to their economic self-interest." Mem. Op. at 32-33 (Page ID 21935-36).

o        "[T]he homogenous nature of real estate services, on its own, provides no evidence to support an inference of collusion. The evidence shows that Defendants' commission rates did decrease by a small, though statistically significant degree, as the price of a home [in]creased. . . . Nevertheless, charging a standard commission rate across the board and retaining increasing profits from the sale of higher priced homes is consistent with rational business judgment and not probative of an illegal agreement to fix commissions." Mem. Op. at 34 (Page ID 21937).

o        "[A]wareness of other real estate companies' commission rates does not tend to rule out independent conduct. As an initial matter, the evidence

does not support Plaintiffs' contention that, for at least part of the Class Period, the full commission was listed on the MLS. Mr. McMahan testified that he was unsure when this practice stopped, but that Lisa Stephenson would know. Ms. Stephenson testified that the full commission had not been listed at least since 1996. . . . Additionally there is no evidence that individuals with pricing authority shared or discussed their respective commission rates. . . . [M]ere awareness of competitors' commissions does not support an inference that Defendants agreed to conspire." Mem. Op. at 34-35 (Page ID 21937-38).

o   "[Plaintiffs' expert] Mr. French notes that brokers and agents *must* cooperate with one another to facilitate real estate sales. . . . Thus, cooperation and communication between Defendants and knowledge of what other brokers charge is just as consistent with independent conduct." Mem. Op. at 36 (Page ID 21939).

o   With respect to Jerry McMahan's comment at the 2000 KREC meeting that "the most unprofessional thing we can do in this business is cut our commissions," the court stated: "[A] consideration of Mr. McMahan's comments in the context of the purpose of the public hearing leads to a more benign interpretation: that Mr. McMahan, in expressing his view that relaxing the KREC Rebate Ban and allowing inducements will help brokers compete with the Internet brokers, differentiates between inducements which cut commission rates–which he views as unprofessional–and non-monetary inducements such as home warranties. A plausible inference is that Mr. McMahan thought full service brokers should not compete with the Internet brokers by offering inducements in the form of rebates, but should compete with the Internet brokers by making their services worth what they charge–whatever that may be." Mem. Op. at 37 (Page ID 21940).

o   "Plaintiffs have presented no evidence of any parallel change or impact on Defendants' pricing decisions after any alleged communication or invitation that was made at the KREC public hearing or any other meeting between Defendants." Mem. Op. at 38 (Page ID 21941).

o   "Plaintiffs contend that Defendants had a common motive to conspire. However, Defendants' motive to maximize profits cannot support an inference of a conspiracy. . . . If this Court were to find that Defendants' motive to maximize profits supported an inference of an illegal conspiracy, then all businesses would be subject to anti-trust liability." Mem. Op. at 39 (Page ID 21942.)

Having reviewed this evidence, which it characterized as circumstantial, the court held that "[p]laintiffs have not presented sufficient evidence to meet the stringent summary judgment standard in § 1 antitrust cases." *Id.*

We quote from the district court's memorandum opinion at length for two reasons. First, after our own independent review of the record, we agree with its conclusion that the circumstantial evidence is insufficient. As the above quoted material makes clear, the evidence does not, as it must, eliminate a finding that the same actions are "equally consistent with independent conduct." *Re/Max Int'l*, 173 F.3d at 1009. Second, the district court's opinion was originally filed under seal and appears not to be readily available on the most common legal databases. Since we rely upon its reasoning, we feel obliged to quote it at some length here.

Finally, we are mindful that plaintiffs have come forward with a good deal of circumstantial evidence that supports its theory of collusion. What is missing, however, is the critical element mentioned in *Matsushita* and reiterated in *Re/Max International*: countering the conclusion reached by the district court that the conduct at issue was also consistent with permissible competition and therefore does not support an inference of antitrust conspiracy. *Matsushita*, 475 U.S. at 588.

## 2.  Did the District Court Err in Limiting Expert Testimony?

In this case, there were three expert witnesses: Drs. French and Yavas for plaintiffs; and Dr. Kleinrichert for defendants. Both sides filed motions to exclude testimony of these experts in whole or in part. In the end, the district court granted defendants' motion to exclude the expert testimony of Drs. French and Yavas with respect to their ultimate opinions that a price-fixing conspiracy existed. Memorandum Opinion & Order at 23, filed July 3, 2012.

With respect to Dr. French's opinions, the district court held as follows:

[T]he Court will not allow Dr. French to testify as to his ultimate opinion that a conspiracy likely existed among the defendants during the class period. Such a conclusion embraces a legal conclusion which depends on anti-trust doctrine in which Dr. French is not qualified to offer an

opinion.  Further, Dr. French fails to differentiate between conscious parallelism and illegal, collusive price-fixing.

Mem. Op. at 11 (citation omitted).  The court reached an identical conclusion with respect to Dr. Yavas.

Federal Rule of Evidence 704(a) states that "[a]n opinion is not objectionable just because it embraces an ultimate issue."  Fed. R. Evid. 704(a). Nonetheless, a witness may not testify to a legal conclusion. *Berry v. City of Detroit,* 25 F.3d 1342, 1353 (6th Cir. 1994).  Our review on this issue is for an abuse of discretion.  *Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676 (6th Cir. 2011).

We detect no abuse of discretion on the part of the district court.  For the most part, the district court rejected defendants' challenge to the expert testimony.  Given that the experts were free to testify at length as to all the other aspect of the real estate market, the exclusion of the challenged testimony, which called for a legal conclusion, is within the purview of the district court.

## *3.  Alter Ego Liability of HSA*

Among the other things considered by the district court was the liability of HSA for actions taken by HSK in the alleged price-fixing conspiracy.  The district court rejected liability for HSA on these grounds:

> The court . . . finds no evidence supporting Plaintiffs' argument that HSA controlled or encouraged Semonin or Rector Hayden's alleged anticompetitive conduct.  There is no evidence that HSA discussed commission policies with Semonin or Rector Hayden, set commission policies for Semonin or Rector Hayden, or encouraged agreement or consensus on commission policies between the two.  Instead, the evidence merely shows circumstances typical of any parent-subsidiary relationship.  Without incurring liability, a parent may articulate and formulate general policies and procedures for its subsidiaries; may coordinate and cooperate and regularly share financial and operating information; may approve its subsidiaries' budgets; and may be directly involved in financing and micro-management of its subsidiaries. . . .
>
> Next, Plaintiffs contend that HSA should be held liable for the alleged conspiracy under an alter ego theory of liability.  As an initial

matter, Plaintiffs have not pled an alter ego or piercing the corporate veil claim in their Fourth Amended Complaint and cannot now, when faced with summary judgment, assert this new theory of liability. Nevertheless, Plaintiffs have not produced evidence which would justify piercing the corporate veil to hold HSA liable for the alleged actions of Semonin and Rector Hayden. . . .

Here, Plaintiffs allege that HSA "refused to produce any documentary evidence showing that its relevant 'subsidiaries' respected basic corporate requirements such as holding regular Shareholder and Board Meetings, promulgating By-Laws and Resolutions, maintaining Minute Books, or requiring its Officers and Directors to know the duties and responsibilities imposed by Kentucky law . . . ."

Plaintiffs have produced no evidence that HSA so dominated HSK's finances, business practices, and policies as to justify piercing the corporate veil.

Mem. Op. at 44-46 (citation omitted).

This issue need not detain us long, particularly in light of the cursory argument advanced by plaintiffs on appeal. First, because we hold that HSK did not engage in price fixing, HSA has no derivative liability. Moreover, our independent review of the record makes clear to us that, as the district court concluded, there is insufficient evidence to support piercing the corporate veil.

**III.**

The judgment of the district court is **affirmed**.